UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

-------------------------------------------------------
                                                    :
ANTHONY MICHAEL GREEN, et al.,          :          CASE NO. 1:03-CV-906
                                                    :
                    Plaintiffs,                     :
                                                    :
vs.                                                 :          MEMORANDUM OPINION
                                                    :          [Resolving Doc. Nos. 96, 149, & 150]
CITY OF CLEVELAND, et al.,               :
                                                    :
                    Defendants.                     :
                                                    :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

        Plaintiff Anthony Michael Green ("Green") was wrongfully convicted of rape and consequently

served thirteen years of custodial detention before being exonerated.  He now sues various parties involved

in the prosecution of his "crime," and seeks damages for claimed violations of his constitutional rights under

42 U.S.C. § 1983, as well as damages under various state law claims.  Each of these defendants now

moves the Court for summary judgment against Green.  For the foregoing reasons, the Court GRANTS

the motion in part and denies it in part.

                                        **BACKGROUND**

        On May 29, 1988, someone entered a room in the Cleveland Clinic Hotel and robbed and raped

J.T., a cancer patient receiving treatment at the Cleveland Clinic and staying at the Clinic Hotel during her

treatment.  J.T. reported the incident to the Cleveland Clinic Foundation Police ("Cleveland Clinic Police").

Case No. 1:03-cv-906
Gwin, J

A Cleveland Clinic Police officer took a statement from J.T., in which she indicated that her assailant was

an African-American man who told her his name was Tony. She also reported that her assailant was about

5'7" and in his early 20s. Hospital and local police began investigating. Upon hearing J.T.'s description

of her assailant and the fact that he was named Tony, a Cleveland Clinic security guard recommended that

authorities investigate Anthony Green, a recently discharged employee. The following day, CCF Police

Officer Lt. Debra DeCapite showed J.T. a photo spread of five black males including Green. The photos

came from hospital records. Andrea Bolton ("Bolton") of the Cleveland Police Department sex crimes

division was also present. J.T. was unable to identify any of the men pictured as her assailant.

On June 1, 1988, Cleveland Clinic investigator Lou DeGross ("DeGross") subjected J.T. to her

fourth interview in three days. Before employment with the Clinic, DeGross worked as a Cleveland police

officer for more than twenty years. By the time Degross interviewed J.T., DeGross had learned that Green

was a suspect, and had secured photos of Green and four other black males from the Cleveland Police

Department. DeGross showed J.T. this second photo lineup. The lineup featured five photographs of

black males. The photographs included placards identifying the individuals' height and weight hanging from

their necks. Although the two pictures of Green used in the two lineups were different and somewhat

dissimilar, Green was the only person repeated in the second photo lineup. Additionally, Green was one

of two people in the second lineup that the placards identified as shorter than 5'10"; the other was 32 years

old. J.T. identified Green as her the man who had assaulted her, and DeGross told her that the person she

selected was named Tony. DeGross then contacted Bolton and told her that J.T. had identified Green as

her attacker.

DeGross continued investigating the case for the Clinic and continued turning the fruits of his

-2-

Case No. 1:03-cv-906
Gwin, J

investigation over to the Cleveland Police Department.  In early June, Green discovered that he was a

suspect in a rape case.  After learning he was a suspect, Green voluntarily went to the Clinic and submitted

to an interview, intending to clear his name.  At the interview, Green explained that he was working with

his uncle during the day and evening of May 29, 1988; that he then participated in foot races on Zoeter

Ave.; that he bathed at his mother's house, and eventually went to bed at the home he shared with his

girlfriend and her children late that night.  Green revealed that he was never near the Clinic that evening; he

said he had not been back to the Clinic since he was discharged on April 7, 1988.  Green denied

committing the rape, and submitted to blood, urine, and hair testing.        Due to botched lab tests of Green's

blood and hair, the details of which are not important for purposes of the claims presently before the Court,

Green remained the only suspect in the case.  On June 22, 1988, the Cuyahoga County grand jury indicted

Green for one count of rape and one count of aggravated robbery, in violation of Ohio Rev. Code §§

2907.02 & 2911.01, respectively.  Four months later, on October 21, 1988, a jury found Michael Green

guilty of both counts.  During this trial, James Draper and Dana Chavers represented Green.  On October

26, 1988, the trial court sentenced Green to ten to twenty-five years for each offense and ordered that the

sentences be served consecutively.

DeGross testified reported to the prosecutor, and testified before the grand jury and at trial, that

during his questioning of Green in early June, Green made inculpatory admissions.  DeGross falsely stated

that that Green "didn't know where he was the evening of May 29, 1988, as he went on a drinking spree

and woke up on some porch."  Green also allegedly gave inconsistent times for the end of his work with

his uncle.  Further, DeGross reported to the prosecutor, "En route to the CPD, Green, when told that the

rapist even informed J.T. that his name was Tony, and that he had been picked out of a photo spread by

-3-

Case No. 1:03-cv-906
Gwin, J

J.T., Green said that, 'I might have told her that' but could not recall due to the apparent blackout." At trial, DeGross testified consistently and explained how Green's statements were inculpatory. DeGross now claims to have made a contemporaneous written record of these statements, but says that it is now missing. The only written record available, however, indicates that Green told DeGross the opposite--that he was innocent. DeGross now, however, denies that he created the reports in which Green denied his guilt, despite the fact that they contain his signature.

Green maintained his innocence and obtained new counsel to aid in his appeal of his conviction. On appeal, he argued that the trial court committed various errors, including failures to properly instruct the jury and to order a new trial. He also argued that Draper and Chavers had not afforded him the effective assistance of counsel, in violation of his Sixth Amendment rights. On March 26, 1990, the Eighth District Court of Appeals rejected all these arguments and affirmed Green's conviction and sentence. *State v. Green*, 67 Ohio App. 3d 72, 585 N.E.2d 990 (Ohio App. 1990).

Even after losing on appeal, Green maintained that he was innocent. Eventually, newly-performed DNA tests corroborated Green's innocence. On October 18, 2001, the Cuyahoga County Court of Common Pleas vacated Green's earlier conviction. A year later, on November 4, 2002, the Cuyahoga County Court of Common Pleas designated Green a "wrongfully imprisoned individual."

On May 15, 2003, Green sued, seeking compensation for alleged constitutional and other violations that led to his wrongful conviction and thirteen years of imprisonment. Green made claims against the City of Cleveland, Bolton, Cleveland serologist Joseph Serowik, Draper, Chavers, the Clinic, Cleveland Clinic Police officer Robert Beck, and DeGross. The Court dismissed Green's claim against Draper as falling outside the applicable statute of limitations. Green settled his claims against the City of Cleveland, Bolton,

-4-

Case No. 1:03-cv-906
Gwin, J

and Serowik, and dismissed his claim against Beck.  Therefore, the only remaining claims are Green's

claims against the Clinic and DeGross.  He sues both of these defendants for violation of his constitutional

rights under 42 U.S.C. § 1983, negligent infliction of emotional distress, intentional infliction of emotional

distress, and loss of consortium.[1]  Additionally, Green sues Chavers for attorney malpractice.

The defendants each moved for summary judgment in March 2004.  Green opposes these motions.

The Court now considers all parties' arguments.

## STANDARD OF REVIEW

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  The moving party has the initial burden of showing the absence of a genuine issue of

material fact as to an essential element of the non-moving party's case.  *Waters v. City of Morristown*,

242 F.3d 353, 358 (6th Cir. 2001).  A fact is material if its resolution will affect the outcome of the lawsuit.

*Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to set forth

specific facts showing a triable issue.  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  It is not sufficient for the non-moving party merely to show that there is some existence of doubt

as to the material facts.  *Id.*

In deciding a motion for summary judgment, the court views the factual evidence and draws all

---

[1] The plaintiff for purposes of the loss of consortium claim is actually Green's mother, Annie Mandell.  Green
added her as a party on August 7, 2003.

Case No. 1:03-cv-906
Gwin, J

reasonable inferences in favor of the non-moving party. *National Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).  Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996) (internal quotations omitted).

## DISCUSSION

## I. GREEN'S § 1983 CLAIMS

Green asserts various claims under 42 U.S.C. § 1983 against both the Clinic and DeGross. Section 1983 reads, in relevant part:

> Every person who, under color of any statute, regulation, custom, or usage of any State . . ., subjects . . . any . . . person . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

42 U.S.C. §1983 (2004).  "In order to succeed on a claim for a violation of § 1983, [a plaintiff] must show that: (1) a person (2) acting under color of law (3) deprived him of his rights secured by the United States Constitution or its laws." *Williams v. Cambridge Bd. of Educ.*, 186 F. Supp. 2d 808, 814 (S.D. Ohio 2002) (citing *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001)).  Keeping these elements in mind, the Court now turns to Green's various § 1983 claims.

## A.  Against Cleveland Clinic Foundation

Green makes a § 1983 claim against the Cleveland Clinic.  With this claim, Green contends that the Clinic had a custom of conducting criminal investigations in order to limit Clinic liability.  Green avers that this practice resulted in the deprivation of his constitutional right to a fair trial and led to Investigator DeGross fabricating evidence, securing an identification of Green using suggestive tactics, and withholding

-6-

Case No. 1:03-cv-906
Gwin, J

exculpatory material.  It is nowhere clear what Constitutional provision requires the Cleveland Clinic avoid investigating criminal conduct on its premises.

Green also advances a theory of § 1983 liability against the Clinic based on an alleged failure to train Clinic investigators as to proper criminal investigative procedures.  Alleging that the Cleveland Clinic fails to provide sufficient training, Green argues that it was self-evident that the investigators would violate the constitutional rights of suspects.[2]

The Clinic argues that Green cannot maintain a claim against it under § 1983.  Specifically, the Clinic states that Green has not identified a policy or custom that was a direct causal link to his constitutional injuries.  Additionally, the Clinic asserts that Green cannot show that its investigators' training was so lacking as to make the Clinic liable for any deprivation of Green's constitutional rights suffered at the hands of its employees.

To maintain a claim under § 1983 based on the Clinic's practices, Green must show a direct causal link between a Clinic policy or custom and the constitutional deprivation Green suffered.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  Moreover, to prevail on his claim of inadequate training, Green must prove that  an identified training deficiency actually caused the injury he suffered.  *Id.* at 391.  In addition, an inadequate training policy serves as the basis for § 1983 liability only where the failure to train

---

[2]Alternatively, Green suggests that because the Clinic is a private actor, the Court might hold it vicariously liable for the acts of its employees.  Green contends that the rationale for precluding government entities from vicarious liability in § 1983 actions has little applicability to private entities such as the Clinic.  As Green concedes, however, the Sixth Circuit has explicitly excluded private entities from vicarious liability under § 1983. *See Street v. Corrections Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996); *see also Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Buckner v. Toro*, 116 F.3d 450, 453 (11th Cir. 1997); *Mejia v. City of New York*, 228 F. Supp. 2d 234, 243 (E.D.N.Y. 2002) (finding private corporation cannot be vicariously liable under § 1983).  Thus, the Court declines to consider the Clinic's liability under a theory of *respondeat superior.*

Case No. 1:03-cv-906
Gwin, J

amounts to "deliberate indifference" by the state actor. *Id.* at 388. Analyzing Green's assertions under these standards, the Court concludes that Green has not raised a material issue of fact regarding his § 1983 claim against the Clinic.

First, the Court finds that Green has not shown evidence of a policy or custom sufficient to impose liability on the Clinic. Green principally complains that DeGross improperly assembled a photo array and then fabricated a confession. In making the claim against the Cleveland Clinic, DeGross points to no Clinic policy even remotely suggesting that confessions should be fabricated or photo arrays should be suggestive. To make out a § 1983 claim, a plaintiff must allege a violation of a right secured by the Constitution or by federal law.

Under *Monell*, the Supreme Court found that liability under § 1983 only attaches to those actors who violate a plaintiff's rights. *Monell v. Department of Social Servs. of New York*, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). The Court concluded that: "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694, 98 S.Ct. at 2037-38. The Supreme Court's rationale in Monell was based on a straightforward reading of the statutory language, requiring that liability be found only against persons who cause the constitutional injury. See Monell, 436 U.S. at 692, 98 S.Ct. at 2036.

*Monell* permits government liability when the challenged conduct implements a formally adopted policy, or when the conduct reflects "practices of state officials so permanent and well settled as to constitute a 'custom or usage' with the force of law." 436 U.S. at 691. See also *Austin v. Paramount*

-8-

Case No. 1:03-cv-906
Gwin, J

*Parks, Inc*., 195 F.3d 715, 728 (4th Cir. 1999) ("We have recognized, as has the Second Circuit, that the principles of § 1983 municipal liability articulated in Monell and its progeny apply equally to a private corporation that em-ploys special police officers. Specifically, a private corporation is not liable under § 1983 for torts committed by special police officers when such liability is predicated solely upon a theory of respondeat superior. . . . Rather, a private corporation is liable under § 1983 only when an official policy or custom of the corporation causes the alleged deprivation of federal rights."); *Rojas v. Alexander's Dept. Store, Inc*., 924 F.2d 406, (2nd Cir. 1990) (A finding that the store security guard did not have probable cause to arrest the customer did not automatically entitle the customer to receive damages, absent evidence that the store had a custom or policy of arresting shoplifting suspects on less than probable cause.); *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997) ("The policy or custom requirement is not a type of immunity from liability but is instead an element of a § 1983 claim. Accordingly, we affirm the district court's finding that the *Monell* policy or custom requirement applies in suits against private entities performing functions traditionally within the exclusive prerogative of the state, such as the provision of medical care to inmates.").

As noted, Green shows no evidence of any Cleveland Clinic practice condoning or encouraging fabricated confessions or suggestive photo arrays. Lacking any evidence showing that a Clinic policy that led to a constitutional violation, Green shifts the argument and contends that the Cleveland Clinic somehow violated his constitutional rights by not sufficiently monitoring whether DeGross and other investigators were investigating felonies, In making this argument, Green shows no authority holding that a private party investigating crimes on its property violates a constitutional right if the investigation involves a felony.

Allowing investigators to investigate felonies on Cleveland Clinic property can only violate Green's

-9-

Case No. 1:03-cv-906
Gwin, J

rights if he can show that allowing these investigations results in a predictable violation.  In *City of Canton v. Harris*, 489 U.S. 378, 387 (1989), the Court found liability could arise, even where the challenged policy was not, itself,  shown to be unconstitutional, but only when the failure to train could predictably lead to constitutional violations.  The Court said:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of  constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury. (footnotes omitted)

*Id*. at 390.

The  parties  agree  that  the  Clinic  did  not  formally  promulgate  a  policy  of  Clinic  investigators conducting criminal investigations of felonies.  In fact, the Clinic's written policy stated that investigators were not to assist in felony investigations unless asked by the Cleveland Police Department.

The Clinic, however, may be liable not only when it implements a formally adopted policy, but also when its conduct reflects practices "so permanent and well settled as to constitute a 'custom or usage' with the force of law."  *Monell*, 436 U.S. at 691.  *Cf. Bouman v. Block*, 940 F.2d 1211, 1231 (9th Cir. 1991) ("If a practice is so permanent and well settled as to constitute a 'custom or usage' with the force of law, a plaintiff may proceed . . . despite the absence of written authorization or express municipal policy.").  A court will attribute the custom or practice to the state actor when the  "duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the . . . governing body [or policymaker with responsibility for oversight and supervision] that the practices have  become customary among its employees."  *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987); *Doe v. New*

-10-

Case No. 1:03-cv-906
Gwin, J

*Philadelphia Pub. Schs. Bd. of Educ.*, 996 F. Supp. 741, 747 (N.D. Ohio 1998) (finding no policy based on isolated incidents of neglectful conduct on part of officials regarding allegations of sexual misconduct by school personnel involving students).

Green cannot make out a constitutional right to avoid a felony investigation by a Cleveland Clinic investigator. And he cannot make out a claim against the Cleveland Clinic unless he can show that allowing such investigations could predictably lead to a violation of Green's rights. Nothing suggests that the Cleveland Clinic adopted a customary policy of allowing felony investigations by its investigators and nothing shows that the Cleveland Clinic had notice of prior constitutional violations by DeGross.

Green relies only on personal experiences with Investigator DeGross to extrapolate the existence of a Clinic policy authorizing the investigation of felony crimes occurring on Clinic premises. In fact, the Clinic asserts, undisputed by Green, that this is the only felony the Clinic internally investigated. This isolated incident is insufficient to establish a custom on the part of Clinic to investigate felonies for purposes of § 1983 liability. *Cf. Carter v. District of Columbia*, 795 F.2d 116, 124 (D.C. Cir. 1986); *Hamilton v. Rodgers*, 791 F.2d 439, 443 (5th Cir. 1986).

Since the establishment of the Cleveland Clinic Police Department, the JT rape was the first felony or rape that occurred on the Cleveland Clinic campus. Restating, Plaintiff Green does not show evidence of any policy or custom to violate suspects rights, fails to show that the Cleveland Clinic had previously allowed its investigators to conduct felony investigations and fails to show that allowing investigators to conduct felony investigations without knowledge of previous constitutional violations would, itself, be actionable.

The Court next considers whether § 1983 liability may be imposed on the basis of a failure to train.

-11-

Case No. 1:03-cv-906
Gwin, J

To impose § 1983 liability under this standard, Green must show deliberately indifferent training on the

Clinic's part.  Under *City of Canton v. Harris*, 489 U.S. 378 (1989), "the inadequacy of training policy

may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference

to the rights of persons with whom the police come into contact." Id. at 388.  A plaintiff establishes

"deliberate indifference" by showing either (1) a failure to provide adequate training in light of foreseeable

consequences that could result from the lack of instruction or (2) a failure to act in response to repeated

complaints of constitutional violations by its employees. *See, e.g., Brown v. Shaner*, 172 F.3d 927, 931

(6th Cir. 1999).

        Green has not presented evidence from which a reasonable jury could find deliberate indifference

under either approach.  Since the Clinic's formal policy precluded investigations of felonies except at the

behest of the Cleveland Police Department, the Clinic could not reasonably have foreseen that its failure

to provide adequate instruction on how to investigate such crimes would result in constitutional violations

of the nature alleged by Green.  As described above, the Cleveland Clinic has had minimal experience with

felony offenses on its campus.

        Moreover, without training, it is obvious that fabricating evidence to be used in the prosecution of

an innocent individual is wrong.  The Court fails to see how training would make this any more manifest.

Training hardly seems necessary for the Clinic's investigators to have known that such actions are

inappropriate.  *See Walker v. City of New York*, 947 F.2d 293, 299-300 (2d Cir. 1992) (finding no

deliberate indifference in failing to train police officers not to commit perjury or aid in the prosecution of the

-12-

Case No. 1:03-cv-906
Gwin, J

innocent).[3/] Thus, the Court finds no deliberate indifference in the Clinic's failure to train to prevent the fabrication of evidence and aiding in the prosecution of the innocent.

Green also sets forth no evidence that the Clinic acquiesced in a pattern of constitutional violations sufficient to show deliberate indifference.  Green offers only his personal experience with the Clinic's investigation department and nothing to suggest a pattern of abuses that would allow a reasonable jury to infer that the Clinic knew its investigators were violating the constitutional rights of suspects, yet refused to act.  In fact, Green has not shown that anyone else complained of constitutional violations caused the Clinic's investigators.

Finding no evidence from which a reasonable jury could find in favor of Green on his § 1983 claim against the Clinic, the Court grants the Clinic summary judgment on this claim.

**B.  Against DeGross**

Green sues DeGross under 42 U.S.C. § 1983 for violating various constitutional rights of his. DeGross argues that these claims are not valid for various reasons.

**1.  "Under Color of Law"**

First, DeGross argues that he did not act "under color of law" and therefore, cannot be held liable under § 1983.  The text of § 1983 establishes action "under color of law" as a prerequisite to a violation. Courts have interpreted "under color of law" as analogous to "state action" for Fourteenth Amendment

---

[3/]Additionally, the Court notes that Green has not shown what type of additional training would have prevented Green's injuries.  Regarding proper investigative procedures DeGross does not appear to have lacked training.  Before working for the Clinic, DeGross served four years as a police officer and 21 years as a detective for the Cleveland Police Department.  Furthermore, all investigators at the Clinic underwent state-approved training through the State of Ohio Peace Officers Training Academy.  *Cf. Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917, 931 (E.D. Wis. 1999) (finding that municipality's adherence to state training standards precluded a reasonable jury from finding that the city's policymakers were deliberately indifferent to the need for better training).

Case No. 1:03-cv-906
Gwin, J

purposes. *See, e.g., Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003) (a § 1983 case citing, among other cases, *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961), which centered on when a private party's actions can be considered "state action" for Fourteenth Amendment purposes).

Prior to 1987, the Cleveland Clinic operated a private security corps.  However, in 1987, the Ohio legislature enacted Ohio Revised Code § 4973.17, which permitted nonprofit hospitals to request that the Governor commission members of their security forces as police officers, provided that they undertook peace officer training.  Under the terms of this law, the Clinic and the Cleveland Police Department entered into General Police Order 31-87 ("GPO").  Under the GPO's terms, Cleveland Clinic Foundation Police Officers

> 1.  May investigate misdemeanor offenses and where appropriate issue minor misdemeanor citations or arrest suspects when there is sufficient cause . . .
>
>         \* \* \*
>
> 3.  Will immediately report all felonies to the Cleveland Police Department and assist in the investigation as requested.

The GPO thus permits Cleveland Clinic Police to become state actors despite the fact that they are employed by a private organization.

DeGross argues that he was never a police officer under the GPO.  In 1988, DeGross had not undertaken peace officer training, and had not been commissioned as a police officer.  Therefore, he argues, he was not a police officer under the GPO; instead he was a private security guard.

DeGross also cites *Chapman v. Higbee*, 319 F.3d 825 (6th Cir. 2003) in support of his claim that he was not a state actor.  This case, however, redounds to *Green's* benefit.  *Chapman* involved a § 1983 suit by a woman who had been suspected of shoplifting and subjected to a strip search conducted by an

-14-

Case No. 1:03-cv-906
Gwin, J

off-duty deputy sheriff working as a security guard at the department store. The Sixth Circuit found genuine issues of material facts on two bases. First of all, the department store's policy mandated police involvement for a strip search to occur. Therefore, where a strip search occurs, a reasonable jury can conclude that the police were involved. Second, the court found that if the plaintiff did not feel free to terminate the encounter based upon objective factors (there, the security guard's badge, uniform, and gun), then a reasonable jury could find that the detention was tantamount to an arrest, and thus attributable to the state.

Considering the reasoning in *Chapman,* the Court finds that genuine issues of material fact regarding state action exist in this case. Although DeGross suggests minimal contact with the investigation, it is clear that DeGross became involved in the investigation in important ways. When Green discovered that he was a suspect in a rape case, he voluntarily went to the Clinic to clear his name. He was immediately directed to DeGross. DeGross also assembled a photo lineup and showed it to the victim. Record evidence also indicates that the prosecutor considered DeGross to be the primary investigating officer. DeGross became intertwined in the investigation of the rape. Therefore, despite DeGross' argument that he was merely a security guard, and thus not permitted to become involved in an investigation, a reasonable jury could find that because DeGross was so involved in the investigation of Green's case, he acted on behalf of the state. Similarly, a reasonable jury could conclude that because Green thought that DeGross was a police detective, he was a state actor. Evidence in the record indicates that when Green was sent to speak to DeGross, he thought he was speaking to a detective. Because Green thought that DeGross was a police officer, a reasonable jury could conclude that DeGross' involvement was tantamount to a police investigation.

-15-

Case No. 1:03-cv-906
Gwin, J

### 2. Qualified Immunity

Next, DeGross argues that even if he did act under color of law, he cannot be required to stand trial because he is entitled to qualified immunity.  In *Harlowe v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court established that government officials performing discretionary functions are immune from damages so long as their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known" at the time they acted.  *Id.* at 818.  This qualified immunity thus insulates government actors from the burdens of trial.  However, the Supreme Court has not extended this immunity to all private actors who are subject to § 1983 liability.  *Richardson v. McKnight*, 521 U.S. 399 (1997), governs the issue of whether a private actor is entitled to assert qualified immunity.  There, the Supreme Court held that prison guards working for a private contractor that the State of Tennessee hired to manage its prisons were not entitled to claim qualified immunity, even though they were subject to § 1983 liability.  The *Richardson* Court set out two factors for courts to consider when determining whether to apply qualified immunity: (1) whether history reveals a "firmly rooted" tradition of immunity for the type of private actors in this case; and (2) whether the qualified immunity doctrine's purposes warrant immunity for this type of private actor.  *Id.* at 404.

Here, DeGross ignores the two *Richardson* factors, relying instead on an outlier case from the Middle District of Alabama.  In *Raby v. Baptist Medical Center*, 21 F. Supp. 2d 1341 (M.D. Ala. 1998), the court found that a police officers of a nonprofit hospital should be afforded qualified immunity.  The court distinguished *Richardson* on the basis that the private prison firm in *Richardson* was subject to competitive pressures, while the nonprofit hospital was not because it was a nonprofit entity.  *Id.* at 357.  DeGross urges the Court to adopt the reasoning of *Raby* and to grant him qualified immunity.

-16-

Case No. 1:03-cv-906
Gwin, J

More recent authority rejects *Raby*. For instance, in *Payton v. Rush-Presbyterian-St. Luke's Medical Center*, 82 F. Supp. 2d 901 (N.D. Ill. 2000), the Northern District of Illinois reached the opposite conclusion facing substantially identical facts. The *Payton* court noted that the *Raby* court took a functional approach to its historical analysis, essentially concluding that because public police had traditionally been entitled to qualified immunity, so too were private police. The Supreme Court itself rejected such a functional approach in *Richardson*. 521 U.S. at 409 (a "purely functional approach bristles with difficulty, particularly since, in many areas, government and private industry may engage in fundamentally similar activities.").

The *Payton* court identified three policy considerations underlying qualified immunity, noting further that the first is the most important: (1) protecting against timidity; (2) ensuring qualified candidates are not deterred from entering public service; and (3) preventing distraction from lawsuits. 82 F. Supp. 2d at 906 (citing *Richardson*, 521 U.S. at 409-11). Regarding the first factor, the *Payton* court rejected the *Raby* court's for-profit/nonprofit distinction, noting that "the behavior of not-for-profit hospitals is similar to that of for-profits: 'while the former does not legally earn a profit for shareholders, it does attempt to maximize fund balances and other measures of economic health.'" *Payton*, 82 F. Supp. 2d at 906 (citing Troyen A. Brennan, *Symposium: Implementing U.S. Health Care Reform*, 19 Am. J.L. & Med. 37, 74 (1993)). Further, the *Payton* court stated, "[i]n this case, as in *Richardson,* the hospital's motivation to be 'profitable' provides the incentive to avoid employing guards who do not perform their jobs adequately or responsibly." *Id.* at 906. Directly addressing *Raby,* the *Payton* court said, "we respectfully disagree that hospitals, in the age of managed care, do not operate in a competitive marketplace." *Id* at 907 n.4. For these reasons, the *Payton* court found that granting qualified immunity to hospital police would not support

-17-

Case No. 1:03-cv-906
Gwin, J

the first policy consideration justifying qualified immunity.

Similarly, the *Payton* court found that the second and third policy considerations did not warrant granting qualified immunity to a private hospital's police force. Regarding the second policy consideration, the court held that the hospital's insurance would indemnify the police, removing the disincentive to work in the nonprofit sector. *Id.* at 907. Finally, regarding the third policy consideration, the court emphasized the presumption against immunity for private actors, and held that if the *Richardson* defendants could not overcome the presumption, then neither could the hospital defendants. *Id.* at 908.

The Court finds the reasoning of *Payton* persuasive. Because DeGross has failed to introduce any evidence that private hospital police traditionally received qualified immunity, and because his policy argument is undercut by the stronger arguments detailed in *Payton*, the Court holds that DeGross is not entitled to qualified immunity.

### 3. Good Faith Defense

Offering an argument in the alternative to his argument in the alternative, DeGross further says that even if he is not entitled to qualified immunity, he is not liable under a "good faith defense." However, courts have not recognized a blanket "good faith" defense to § 1983 actions. In *Wyatt v. Cole*, 504 U.S. 158, 169 (1992), the Supreme Court explicitly left open the question of whether such a defense exists. The Court punted again on this issue in *Richardson v. McKnight*, 521 U.S. 399, 413 (1997). DeGross claims that the Sixth Circuit recognized a good faith defense to § 1983 actions in *Duncan v. Peck,* 844 F.2d 1261 (6th Cir. 1988). However, *Duncan* did not go as far as DeGross claims. Instead, the *Duncan* court recognized a good faith defense only to § 1983 actions based upon malicious prosecution and wrongful attachment, reasoning that because a good faith defense was avaiulable against such claims at common law,

-18-

Case No. 1:03-cv-906
Gwin, J

so too should it be available when pled under § 1983.  *Id.* at 1267-68.

DeGross is not entitled to a good faith defense in this case.  First, Green's claimed § 1983 violations include violations of rights other than the right to be free from malicious prosecutions.  Therefore, even if the good faith defense were available, it would bar only some of the theories upon which Green's claims are based.  More importantly, though, the Court finds that the good faith defense is not available. At the very heart of this case lies a factual dispute as to whether DeGross conducted his investigation in good faith.  DeGross predictably asserts that he did.  Green, on the other hand, offers evidence indicating that DeGross perjured himself in an attempt to convict Green and concocted tales of false confessions.  In a case where the plaintiff argues--and produces evidence tending to show--that a defendant framed him for a crime that he did not commit, that defendant cannot avail himself of a good faith defense on summary judgment.  After all, the crux of Green's case is that DeGross acted in *bad faith* in investigating the rape of J.T.  For these reasons, the Court rejects DeGross' claimed good faith defense, and concludes that he is not entitled to summary judgment on this ground.

### 4.  Violation of Laws

In his reply brief, DeGross argues that Green cannot base a § 1983 claim on the use of a suggestive lineup.  The Court notes that Green has asserted various other doctrinal hooks for his § 1983 claims against DeGross, including a violation of due process by fabricating evidence and a violation of the right to a fair trial by withholding exculpatory information.  Thus, DeGross' argument is insufficient to entitle him to summary judgment on Green's § 1983 claims.  If DeGross is correct, he will merely prevent Green's § 1983 claim from proceeding on an additional theory.

Courts have not recognized a constitutional right to be free from suggestive lineups.  Instead,  they

-19-

Case No. 1:03-cv-906
Gwin, J

have constructed a "prophylactic rule" barring admission of evidence from unnecessarily suggestive lineups. *See Hutsell v. Sayre,* 5 F.3d 996, 1004-05 (6th Cir. 1993); *Hensley v. Carey,* 818 F.2d 646, 649 (7th Cir. 1987). This rule, in turn, protects the core due process right to a fair trial. *Hensley,* 818 F.2d at 649. In this sense, defendants have no right to an impartial lineup; instead, a component of their right to a fair trial is the right not to have suggestive lineups admitted into evidence at trial. Courts analyze such due process violations by referencing the "the totality of the circumstances" surrounding the lineup. *Stoval v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds by Griffith v. Kentucky,* 479 U.S. 314 (1987). To find a violation of this right under the totality of the circumstances, the plaintiff must show that "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 197 (1972)

Here, the Court does not find that the totality of the circumstances regarding the lineup render it so impermissibly suggestive. Record evidence demonstrates that J.T. picked Green out of the lineup, that J.T. had sufficient presence of mind during the assault to view her assailant, that Green closely matched her description of the perpetrator, and that DeGross testified at trial that he did not "give her any hints or inclinations which individual [in the photo spread] was the defendant." (Trial Tr. at 118-19). Green offers no admissible evidence to rebut these facts.

Rape victim J.T. testified in deposition before the criminal trial with regard to her identification:

Q.     When did you first see these photos before?

A.     The first time that I saw them was in my hospital room when I was moved back
       to the hospital after that happened and a second time outside, just a little while ago
       outside this room.

-20-

Case No. 1:03-cv-906
Gwin, J

Q.     Now tell us of the first occasion that you saw these?  Who showed you these

        photographs and in what manner?

A.     Inspector DeGross showed me – he handed them to me and said here's some

        pictures for you to take a look at.

Q.     Okay.

A.     And I identified this person in this picture here.

                                        * * *

Q.     Now tell me as best as you can, Miss Tennant, how that occurred, how he came

        in, how you were shown the pictures, how the whole conversation about the

        pictures was introduced as far as you can remember?

A.     He came in and talked to me a little while and then they left and then they came

        back a while later, maybe a couple of hours later.  He just casually handed me the

        pictures and said just take a look at these and that was when I identified Mr.

        Green.[4]

She testified in a similar manner at trial:

A.     There were six or seven, I believe.  And he just casually handed them to me and

        said just look through these.  And I looked through them, and I knew that was the

        guy when I saw the picture.[5]

---

[4] Tr. at 32-33, 44-45.

[5] Tr. at 63

-21-

Case No. 1:03-cv-906
Gwin, J

Even if Green were to show that the lineup were impermissibly suggestive, he would still not be

able to make a claim out against DeGross.  Recall that there is no constitutional right to an impartial lineup.

Rather, there is a constitutional right to a fair trial, and a prophylactic evidentiary prohibition against

suggestive lineups supports this right.  DeGross did not offer or allow into evidence information derived

from the lineup.  Therefore, if Green's due process right to a fair trial had been violated, DeGross was not

the culprit.  Instead, the judge and the prosecutor would be the proper parties against whom to assert this

claim.  *They*, not DeGross, enabled the evidence deriving from the lineup to get before the jury.

## II.  GREEN'S § 1983 CONSPIRACY CLAIMS

Defendants move for summary judgment on Green's § 1983 conspiracy claims, arguing that there

is no evidence of any conspiracy.  Because Green does not offer any evidence of an agreement among the

various actors in his prosecution, he fails to meet his burden under *Celotex v. Catrett*, 477 U.S. 317

(1986).  The Court therefore GRANTS defendants' motion for summary judgment on Green's § 1983

conspiracy claims.

## III.  GREEN'S CLAIMS UNDER THE OHIO CONSTITUTION

Defendants Cleveland Clinic Foundation and Lou DeGross move for summary judgment on

Green's claims under the Ohio Constitution.  Because Green does not contest their motions, the Court

GRANTS summary judgment to defendants on Green's state constitutional claims.

## IV.  GREEN'S EVIDENCE SPOLIATION CLAIMS

Defendants Cleveland Clinic Foundation and Lou DeGross move for summary judgment on

Green's state-law claims for spoliation of evidence.  Because Green does not contest their motions, the

-22-

Case No. 1:03-cv-906
Gwin, J

Court GRANTS summary judgment to defendants on Green's evidence spoliation claims.

## V.  GREEN'S MALICIOUS PROSECUTION CLAIMS

Defendants Cleveland Clinic Foundation and Lou DeGross move for summary judgment on Green's state-law malicious prosecution claims. Because Green does not contest their motions, the Court GRANTS summary judgment to defendants on Green's Ohio malicious prosecution claims.

## VI.  GREEN'S CLAIMS FOR COMMON LAW CONSPIRACY

Defendants move for summary judgment on Green's common law conspiracy claims, arguing that there is no evidence of any conspiracy. Because Green does not offer any evidence of an agreement among the various actors in his prosecution to violate his rights, he fails to meet his burden under *Celotex v. Catrett*, 477 U.S. 317 (1986). The Court therefore GRANTS defendants' motion for summary judgment on Green's common law conspiracy claims.

## VII.  GREEN'S CLAIMS FOR INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### A.  Intentional Infliction of Emotional Distress

Green sues the Clinic and DeGross for intentional infliction of emotional distress. The defendants move for summary judgment on these claims, arguing that the absolute privilege afforded to testimony before a jury precludes Green from offering any evidence in support of these claims.     The Supreme Court of Ohio has defined the tort of intentional infliction of emotional distress as "one who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress." *Wright v. MetroHealth Medical Center*, 58 F.3d 1130, 1139 (6th Cir. 1995) (citations omitted). To establish a claim for intentional emotional distress, Plaintiff must show

-23-

Case No. 1:03-cv-906
Gwin, J

that: (1) the tortfeasor intended to cause the plaintiff serious distress; (2) the tortfeasor's conduct was so extreme and outrageous that it went beyond all possible bounds of decency, and can be considered completely intolerable in a civilized society; (3) the tortfeasor's conduct proximately caused the plaintiff's emotional distress; and (4) the plaintiff suffered mental anguish of a nature that no reasonable man could be expected to endure. *Rigby v. Falls Equipment Co., Inc.*, 150 Ohio App. 3d 155, 166, 2002-Ohio-6120, 779 N.E.2d 1056, 1064 (Summit Cty. App. 2002).

Defendants, cloaking the false trial testimony under absolute privilege, assert that Green cannot establish the first element of the claim. Under Ohio law a witness enjoys absolute privilege for statements made in a judicial proceeding, so long as the statements bear a reasonable relationship to the activity reported. *M.J. DiCorp, Inc. v. Sweeney*, 69 Ohio St.3d 497, 505, 634 N.E.2d 203, 209 (1994). Absolute privilege still shields a witness from civil liability even when that witness knowingly gives false testimony. *Schmidt v. State Aerial Farm Statistics, Inc*., 62 Ohio App.2d 48, 403 N.E.2d 1026 (Lucas Cty. App. 1978).

Defendants' argument is based on a fallacious assumption--that Green cannot establish evidence of DeGross' intent without relying on DeGross' testimony at trial. Green, however, may attempt to present evidence of intent through other means. For instance, Green argues that DeGross failed to hand over exculpatory evidence to the Green. This is one example of non-testimonial activity potentially indicative of DeGross' intent to frame Green, thereby causing him serious emotional distress. Additionally, it is not clear when DeGross first fabricated and relayed story of Green's "confession" to Prosecutor McGinty. Plaintiffs have produced a document indicating that DeGross provided this information to Prosecutor McGinty before he testified, but the gap of time between the communication and the testimony is unclear.

-24-

Case No. 1:03-cv-906
Gwin, J

(Exh. 56 to Pl. Brief).  Drawing all factual inferences in favor of Green (as the Court must on summary

judgment), it is reasonable to presume that DeGross did not fabricate that story moments before testifying,

but rather relayed it to the prosecutor early in the course of the investigation.  This, too, qualifies as a non-

testimonial action, despite the fact that it led to testimony.  *See, e.g., Spurlock v. Satterfield*, 167 F.3d

995, 1001 (6th Cir. 1999) ("The simple fact that acts may ultimately lead to witness testimony does not

serve to cloak these actions with absolute testimonial immunity.") (citing *Buckley v. Fitzsimmons*, 20 F.3d

789, 796 (7th Cir. 1994); *id.* ("absolute testimonial immunity does not 'relate backwards' to 'protect [a

defendant] from any activities he allegedly engaged in prior to taking the witness stand for his grand jury

testimony.'") (quoting *Mastoianni v. Bowers*, 160 F.3d 671, 677 (11th Cir. 1998)).

Because a reasonable jury could conclude that DeGross' non-testimonial acts indicate an intent

to cause Green severe emotional damage, a genuine issue of material fact exists with regard to the first

element.  Similarly, a reasonable jury could conclude that acting to frame someone for a crime he did not

commit falls outside all possible bounds of decency and is completely intolerable in a civilized society.

Clearly, a reasonable jury could consider DeGross' alleged act of framing Green for J.T's rape the

proximate cause of Green's emotional damages.  Finally, a reasonable jury could conclude that spending

thirteen years in prison for a crime he did not commit caused Green mental anguish of the sort that a

reasonable man would not be expected to endure.  Genuine issues of material fact exist for each element

of the intentional infliction of emotional distress claim.  The Court therefore denies defendants' motion on

this claim.

## B. Negligent Infliction of Emotional Distress

Green also argues that the defendants are liable for negligently inflicting emotional distress upon

-25-

Case No. 1:03-cv-906
Gwin, J

him.  Defendants contest this claim, arguing that Ohio law does not provide for negligent infliction of

emotional distress under the fact pattern of this case.

In *Heiner v. Moretuzzo*, 73 Ohio St. 3d 80 (1995), the Ohio Supreme Court set out Ohio's law

on negligent infliction of emotional distress claims.  According to the court, such claims are permissible

when:

> 1. The plaintiff is directly involved in an accident, but not injured, *see Schultz v. Barberton Glass Co.,* 4 Ohio St. 3d 131 (1983);
> 2. The plaintiff is a bystander to a physical calamity and suffers emotional injuries that are (a) severe and debilitating and (b) reasonably foreseeable, *see Paugh v. Hanks,* 6 Ohio St. 3d 72 (1983); OR
> 3. The plaintiff suffers physical injuries and emotional injuries from the same accident, even when the emotional injuries are not severe and debilitating, *see Binns v. Fredendall,* 32 Ohio St. 3d 244 (1987).

*Heiner*, 73 Ohio St. 3d at 82-85.

In *Heiner*, the Ohio Supreme Court disagreed with the notion that "*Paugh* and *Schultz* permit

recover for emotional distress where . . . the plaintiff neither witnessed nor was exposed to any real or

impending physical calamity."  73 Ohio St. 3d at 85.  The Court thus rejected plaintiff's claims based on

a false-positive HIV test and diagnosis.  Similarly, Green has produced no evidence of exposure to a real

or impending physical calamity, other than being sent to prison.  While prison life certainly placed many

physical constraints on Green, it is not akin to the type of instantly tragic accidents that *Schultz* (pane of

glass falling onto plaintiff's car while plaintiff was driving), *Paugh* (motorists running a stop sign and driving

into an area of plaintiff's yard where plaintiff's children played), and *Binns* (auto accident in which plaintiff's

boyfriend died and bled all over her clothing) involved.  The Court therefore cannot conclude that the Ohio

Supreme Court would recognize a viable negligent infliction of emotional claim for wrongly being sent to

Case No. 1:03-cv-906
Gwin, J

prison; Green's claims therefore must fail.

### VIII.  ANNIE MANDELL'S CLAIMS FOR LOSS OF CONSORTIUM

Annie Mandell ("Mandell"), Green's mother, asserts a claim against DeGross and the Clinic for loss of consortium.  Both defendants argue that they are entitled to summary judgment on this claim because Ohio has yet to recognize a loss of consortium claim for a parent who loses the consortium of an adult child.

Defendants are entitled to summary judgment on Mandell's claim of loss of consortium because Ohio law dos not permit a parent to recover for the loss of consortium of an adult child.  Ohio recognizes a cause of action only for the loss of a minor child's consortium and services.  *Cole v. Broomsticks, Inc.*, 107 Ohio App. 3d 573, 577, 699 N.E.2d 253, 256 (Ohio App. 1 Dist. 1995).  The distinction between adult and minor children relates to the parent's duty of care.  While parents bear a "natural and legal burden of care for minor children;" they do not bear any burden for adult children.  *Id.* (citing *Paroline v. Doling Assoc.*, 1990 Ohio App. LEXIS 4952 (Montgomery Cty. App. Nov. 15, 1990)).   Absent this duty of care, the common law right to relief for loss of consortium does not extend to actions by parents for loss of the company and services of their adult children.  *Id*.  In this case, it is undisputed that Plaintiff Anthony Green was 23 years of age at the time of his incarceration and therefore not a minor child.  Because he was an adult during all times relevant to this case, his mother did not owe him a duty of care and thus cannot recover for loss of consortium.

The Plaintiff contends that the Ohio Supreme Court has recognized claims brought by  parents for loss of consortium of their adult children.  However, plaintiffs overstate the law.  While the court in *Rolf v. Tri-State Motor Transit Co.*, 91 Ohio St.3d 380, 381 (2001), did hold that adult emancipated children

Case No. 1:03-cv-906
Gwin, J

could recover for the loss of parental consortium, it did not expressly hold that parents may recover for the loss of consortium of an adult child.  *Id.*  In that case, the court adopted the reasoning of an Arizona court which stressed that prohibiting recovery for loss of consortium based on an age requirement was "illogical and inconsistent with common sense and experience."  *Frank v. Maricopa County Superior Court*, 150 Ariz. 228, 233 (1986).  While Arizona may recognize claims brought by parents for loss of consortium of adult children, Ohio has yet to do so explicitly.  As a federal court, this Court is bound to apply state law consistently with decisions from the Ohio Supreme Court, and where that court is silent, to predict what rule it would apply.  The Court is unconvinced that the Ohio Supreme Court would recognize Mandell's claim for loss of consortium of her grown son, and therefore GRANTS defendants' motion for summary judgment on this claim.

## IX.  GREEN'S CLAIM FOR ATTORNEY MALPRACTICE

Finally, Green asserts a claim against his former attorney Dana Chavers seeking damages for attorney malpractice.  Green pursued an identical claim against Chavers' co-counsel James Draper.  On February 9, 2004, the Court dismissed Green's claim against Draper as falling outside Ohio's one-year statute of limitations for attorney malpractice claims.  The Court determined that under Ohio's accrual rules, Green's cause of action against Draper accrued over a decade ago.  Chavers moves for summary judgment, arguing that the same reasons leading to Draper's dismissal compel summary judgment in her favor.

Green argues in response that the version of the Ohio tolling statute in force at the time of his conviction tolled the statute of limitations until Green was released from prison.  Currently, the Ohio tolling statute provides for tolling only if the would-be plaintiff is "within the age of minority or of unsound mind[.]"

-28-

Case No. 1:03-cv-906
Gwin, J

*See* Ohio Rev. Code § 2305.16 (2004).  However, the version of the statute in place prior to July 13, 1990 provided for tolling if the would-be plaintiff was "within the age of minority, of unsound mind, or imprisoned[.]" *See* S.B. 125, 118th Gen. Assemb. (Ohio 1990).  The tolling would continue until "such disability is removed." *Id.*  Green argues that on that basis, the one-year statute of limitations applicable to attorney malpractice claims in Ohio did not start running until his disability was removed.

Even so, Green's claim against Chavers fails.  Green's brief in opposition to summary judgment states that "[h]e was exonerated and freed on his birthday, October 18, 2001."  (Pl. Brief at 1).  He thus had one year from October 18, 2001--the date upon which his disability terminated--to bring his claim.  Yet, Green did not file his claim against Chavers until May 15, 2003, a date that is over six months past the October 18, 2002 deadline.[6/]  Chavers is therefore entitled to summary judgment notwithstanding Green's argument that the statute of limitations was tolled.  The Court GRANTS Chavers' motion.

## X.  CONCLUSION

In conclusion, the Court GRANTS the Cleveland Clinic Foundation's motion for summary judgment on Green's § 1983 claim, and DENIES DeGross' motion for summary judgment on Green's § 1983 claim (with the caveat that Green may not proceed to the jury on the suggestive lineup theory).  Additionally, the Court DENIES Cleveland Clinic Foundation's and DeGross's motion for summary judgment on Green's intentional infliction of emotional distress claim, but GRANTS their motions for summary judgment on all remaining claims.  Finally, the Court GRANTS Dana Chavers' motion for

---

[6/] The Court notes that Green filed the claim against Draper on the same date.  Therefore, the reasoning in this opinion constitutes an alternative ground in support of the Court's earlier decision to dismiss of Draper.

Case No. 1:03-cv-906
Gwin, J

summary judgment in its entirety.

      IT IS SO ORDERED.


Dated: May 27, 2004                              s/           *James S. Gwin*
                                                  JAMES S. GWIN
                                                UNITED STATES DISTRICT JUDGE